## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| JOSHUA COTTON, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>ALN MEDICAL MANAGEMENT LLC, and NATIONAL SPINE AND PAIN CENTERS LLC.,<br><br>  Defendants. | Case No.: 4:25-cv-3082<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Joshua Cotton brings this Class Action Complaint against Defendants ALN Medical Management LLC ("ALN") and National Spine and Pain Centers, LLC ("NSPC") (collectively, "Defendants"), and each of their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, members, and/or other related entities, and upon personal knowledge as to his own actions, and information and belief as to all other matters, alleges as follows:

### INTRODUCTION

1.      This action arises out of the public exposure of Defendant NSPC's current and former patients' confidential, private information, including their Personally Identifying

1

Information[1] ("PII") and Protected Health Information ("PHI")[2] (collectively "Personal Information"). The Personal Information of Plaintiff and the Class Members was in the possession of Defendants at the time of a cyberattack on ALN's systems, beginning in or around March 2024, which was caused by Defendants' collective failures to adequately safeguard that Personal Information ("the Data Breach").

2.      According to information Defendants provided to the Texas' Attorney General's Office, the Personal Information disclosed, without authorization, in the Data Breach includes patients' names, Social Security numbers, driver's license numbers, government-issued ID numbers (e.g., passport, state ID card), financial information (e.g., account number, credit or debit

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the Data Breach.

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a group health plan. *Id. Covered entity, Health plan*. A "business associate" is defined as, with respect to a covered entity, a person who: "creates, receives, maintains, or transmits protected health information for a function or activity regulated by [HIPAA], including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, patient safety activities listed at 42 CFR 3.20, billing, benefit management, practice management and repricing…" *Id. Business associate*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, Dep't for Health & Hum. Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 5, 2022). NSPC is clearly a "covered entity," and ALN is clearly a "business associate," subject to HIPAA, and some of the PHI compromised in the Data Breach is "protected health information," subject to HIPAA.

card number), health insurance information, and medical information.[3]

3.      ALN, a healthcare advisory firm, provides services such as physician, facility, and non-par provider hospital billing, professional coding, claims recovery, review of billing practices, and credentialing.[4]

4.      NSPC provides chronic pain treatment to patients across the country.[5]

5.      Defendants failed to undertake adequate measures to safeguard the Personal Information of Plaintiff and the proposed Class Members.

6.      Although Defendants purportedly discovered the Data Breach in March of 2024, they failed to immediately notify and warn current and former patients, with ALN waiting until March 21, 2025, to provide written notice to Plaintiff and the proposed Class.[6]

7.      As a direct and proximate result of Defendants' failures to protect current and former patients' sensitive Personal Information and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

## PARTIES

8.      Plaintiff, Joshua Cotton, is a natural person and resident and citizen of Virginia, where he intends to remain. Plaintiff Cotton is a former patient of NSPC, and a Data Breach victim.

9.      Defendant ALN is a Limited Liability Company organized and existing under the

---

[3] *Data Security Breach Reports*, Office of Texas' Attorney General, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Apr. 3, 2025).
[4] *ALN Medical Management LLC*, Bloomberg, https://www.bloomberg.com/profile/company/0370828D:US?embedded-checkout=true (last visited Apr. 1, 2025).
[5] National Spine & Pain Centers, https://www.treatingpain.com/ (last visited Apr. 3, 2025).
[6] Letter from Gregory Lederman of Mullen Coughlin LLC, attorney for ALN Medical Management, to Office of the New Hampshire Attorney General (Mar. 21, 2025), https://mm.nh.gov/files/uploads/doj/remote-docs/aln-medical-management-20250321.pdf.

laws of the State of Delaware with a principal place of business in Lincoln, Nebraska.

10.     Defendant NSPC is a Delaware limited liability company with its principal place of business located at 2711 Centerville Road, Wilmington Delaware 19808.

## JURISDICTION & VENUE

11.     This Court has original jurisdiction over this action under the Class Action Fairness Act 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

12.     This Court has personal jurisdiction over Defendants because Defendant ALN's principal place of business is in Nebraska, and Defendants regularly conduct business and enter into contracts within the State of Nebraska.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because ALN's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND FACTS

### A.     Defendants ALN and NSPC

14.     Defendant ALN "offers billing and claims submission, coding, compliance, month end closing, performance management, information technology, and quality management services" to physician practices across the country.[7]

15.     According to Defendant NSPC's Website: "Our mission: To end needless human

---

[7] *ALN Medical Management LLC*, Bloomberg, https://www.bloomberg.com/profile/company/0370828D:US?embedded-checkout=true (last visited Apr. 1, 2025).

pain and suffering through world-class care."[8]

16.    On information and belief, ALN is a service provider of NSPC performing medical billing for NSPC and was provided with Plaintiff's and the proposed Class Members' Personal Information during the regular course of providing services for NSPC.

17.    NSPC requires that its patients provide it with their Personal Information, which NSPC provides to ALN in connection with ALN performing these services.

18.    ALN collects and stores Plaintiff's and the proposed Class Members' Personal Information on its information technology computer systems, including but not limited to their name, health insurance information, demographic information, and medical information.

19.    When Defendants collect this Personal Information, they promise to use reasonable care to protect and safeguard the Personal Information, from unauthorized disclosure.

20.    NSPC maintains a Notice of Privacy Practices in which it states that "[w]e are permitted or required by law to make certain other uses and disclosures of your health information without your consent or authorization in the following ways. How else can we use or share your health information? We are allowed or required to share your information in other ways – usually in ways that contribute to the public good, such as public health and research. We have to meet many conditions in the law before we can share your information for these purposes."[9]

21.    On information and belief, ALN maintained an identical or substantially similar policy prior to the Data Breach.

22.    None of the purposes for which Defendants may disclose patient Personal

---

[8] *Mission, Vision, & Values*, National Spine & Pain Centers,
https://www.treatingpain.com/about-us/mission-vision-values/ (last visited Apr. 3, 2025).
[9] *HIPPA Notice of Privacy Practices*, National Spine & Paine Centers,
https://www.treatingpain.com/patient-resources/hipaa-notice-of-privacy-practices/ (last visited Apr. 3, 2025).

Information without authorization include a scenario such as the Data Breach.

23.      NSPC represented to its patients that it would take adequate measures to safeguard their Personal Information, including ensuring that its business associate, ALN, undertook adequate measures to safeguard that Personal Information, and Plaintiff and members of the proposed Class relied on NSPC's representations when they agreed to provide their Personal Information to NSPC.

24.      Despite their alleged commitments to securing sensitive patient data, Defendants do not follow industry standard practices in securing patients' Personal Information and failed to protect the Personal Information of Plaintiff and the proposed Class Members from unauthorized disclosure in the Data Breach.

**B.      Defendants ALN and NSPC Fail to Safeguard Personal Information – the Data Breach**

25.      Between March 18 and March 24, 2024, ALN experienced a cyberattack to its computer information technology systems by an "unauthorized threat actor," which resulted in the unauthorized disclosure and exfiltration of patients' Personal Information, including that of Plaintiffs and the Class Members.[10]

26.      Nevertheless, Defendants waited almost a ***full year*** to inform affected current and former patients of the unauthorized disclosure of their Personal Dara Breach in the Data Breach, waiting until March 21, 2025 for ALN to provide written notice to Plaintiff and the Class.

27.      On or about March 21, 2025, ALN began sending written notice of the Data Breach to affected current and former patients, including Plaintiff, and the proposed Class Members.[11]

---

[10] Letter from Gregory Lederman of Mullen Coughlin LLC, *supra*.
[11] *Id*.

The Data Breach Notice stated:

> In March 2024, ALN identified suspicious activity related to certain systems being hosted by a third-party service provider. Upon learning of this activity, ALN promptly took steps to ensure the security of ALN systems, isolated the impacted environment, and launched an investigation to determine the nature and scope of the activity. While the incident did not impact internal ALN systems, the investigation determined that certain files and folders within the third-party hosted environment were accessed or taken by an unauthorized actor between March 18, 2024 and March 24, 2024.[12]

28.    The notice Plaintiff received from Defendants indicated that the Data Breach included names, date of births, health insurance information, demographic information, and medical information.

29.    In addition, in its Data Breach Notice, ALN recommended that affected persons "remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring free credit reports," place fraud alerts and security freezes on their credits files, and contact the consumer reporting agencies.[13]

30.    The ALN Data Breach Notice did not further elaborate on the nature or extent of the Data Breach, omitting its scope or size.

31.    Defendants' conduct, by acts of commission or omission, caused the Data Breach, including: ALN's failures to implement best practices and comply with industry standards concerning computer system security to adequately safeguard patient Personal Information, allowing Personal Information to be accessed and stolen, and by failing to implement security measures that could have prevented, mitigated, or timely detected the Data Breach, and by failing to adequately train its employees on cybersecurity policies, enforce those policies, or maintain reasonable security practices and systems, resulting in the Data Breach; as well as NSPC's failure

---

[12] *Id*.
[13] *Id*.

to ensure their business associate, ALN, undertook these data security measures and appropriate employee training, prior to NSPC providing ALN with Plaintiff's and the Class Members' PII and PHI.

32.     On information and belief, as more fully articulated below, Plaintiff and Class Members' Personal Information was disclosed without authorization to, and actually "exfiltrated by," third-party cybercriminals in the Data Breach, and has now or will imminently be posted to the Dark Web for public viewing and use, in the public domain, and/or utilized for criminal and fraudulent purposes and misuse.

## C.    Plaintiff's Experience

33.     Plaintiff, Joshua Cotton, is a former patient of NSPC, who received treatment from NSPC.

34.     As a condition of receiving NSPC's medical services, Plaintiff was required to provide his Personal Information to NSPC, which NSPC then provided to ALN in connection with ALN's medical billing services. This Personal Information included but is not limited to, Plaintiff's name, health insurance information, demographic information, and medical information.

35.     Plaintiff typically takes measures to protect his Personal Information and is very careful about sharing his Personal Information. Plaintiff has never knowingly transmitted Personal Information over the internet or other unsecured source.

36.     Plaintiff stores any documents containing his Personal Information in a safe and secure location, and he diligently chooses unique usernames for his passwords and online accounts.

37.     In entrusting his Personal Information to Defendants, Plaintiff believed that, as part of the payments for medical treatment and services, Defendants NSPC and ALN would adequately safeguard that information. Had Plaintiff known that ALN did not utilize reasonable data security

measures, and that NSPC did not ensure ALN utilized reasonable data security measures, Plaintiff would not have entrusted his Personal Information to said Defendants or would have paid less for those treatments and services.

38.     Plaintiff received ALN's Data Breach Notice dated March 21, 2025, informing him that his Personal Information, including his name, date of birth, health insurance information, and demographic information was impacted and exfiltrated in the Data Breach.

39.     As a direct and proximate result of the Data Breach permitted to occur by Defendants, Plaintiff has suffered, and imminently will suffer, injury-in-fact and damages, including the unauthorized disclosure of the Personal Information itself, which, on information and belief due to the nature of the cyberattack, has been or imminently will be used for criminal, fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale; Plaintiff has been and will be forced to expend considerable time and effort to monitor his accounts and credit files, changing his online account passwords, verifying the legitimacy of Defendant ALN's Data Breach Notice and researching the Data Breach, to protect himself from identity theft and fraudulent misuse of his Personal Information, disclosed as a result of the Data Breach.

40.     In addition, as a result of the Data Breach, Plaintiff also suffered diminution in the value of his Personal Information, a form of intangible property that he entrusted to NSPC and ALN for the sole purpose of obtaining medical services.

41.     Plaintiff also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

42.     Furthermore, Plaintiff has been caused significant worry and feelings of anxiety and emotional distress regarding the disclosure of his Personal Information in the Data Breach.

43.     Plaintiff fears for his personal financial security and uncertainty over the

information disclosed in the Data Breach and is experiencing emotional distress over the unauthorized disclosure of his Personal Information. He is experiencing feelings of anxiety, embarrassment, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

44.    Plaintiff was highly disturbed by the Data Breach's nature, the thought of cybercriminals accessing his highly sensitive Personal Information, and the harm caused by the Data Breach. He was also outraged that Defendants took a year to notify him of the Data Breach.

45.    Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching and verifying the legitimacy of the Data Breach upon receiving the Notice, and monitoring financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach––valuable time Plaintiff otherwise would have spent on other activities, including, but not limited to, work and/or recreation. This time has been lost forever and cannot be recaptured.

46.    Plaintiff suffered actual injury from having his Personal Information compromised as a result of the Data Breach, including, but not limited to: (i) invasion of privacy; (ii) theft of Personal Information; (iii) lost or diminished value of Personal Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Personal Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants

fail to undertake appropriate and adequate measures to protect the Personal Information.

47.    As a result of the Data Breach, Plaintiff faces a lifetime risk of identity theft, as it includes sensitive information that cannot be changed.

48.    Furthermore, Plaintiff's sensitive Personal Information remains in Defendants' possession without adequate protection against known threats, exposing Plaintiff to the prospect of additional harm.

**D.    This Data Breach was Foreseeable by Defendants.**

49.    Plaintiff and the proposed Class Members provided their Personal Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

50.    By failing to do so, Defendants put Plaintiff and Class Members at risk of identity theft, financial fraud, and other harms.

51.    Defendants tortiously, or in breach of their implied contracts, failed to take the necessary precautions required to safeguard and protect the Personal Information of Plaintiff and the Class Members from unauthorized disclosure. Defendants' actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

52.    Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Personal Information and the critical importance of providing adequate security for that information.

53.    According to a Chief Strategy Officer at ClearDATA, "[i]t's no secret that healthcare is the industry most plagued by data breaches. Patient data is the most valuable, making

11

it targeted by bad actors."[14]

54.     The exposure of PHI is a widespread problem. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[15] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[16] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[17]

55.     According to an article posted in the HIPAA Journal on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[18]

56.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, SSNs, financial information, health insurance information,

---

[14] Sanjay Cherian, *Healthcare Data: The Perfect Storm*, Forbes.com (January 14, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=28523ee56c88.

[15] Adil Hussain Seh, et al., *Healthcare Data Breaches: Insights and Implications,* National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare- 08-00133/.

[16] Steve Alder, *December 2019 Healthcare Data Breach Report,* The HIPAA Journal (Jan. 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/.

[17] Rody Quinlan, *Healthcare Security: Ransomware Plays a Prominent Role in COVID-19 Era Breaches*, Tenable (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches/.

[18] Steve Alder, *Editorial: Why Do Criminals Target Medical Records,* The HIPPA Journal (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records/.

and medical and clinical data, and that information can be easily monetized."[19]

57.    The HIPAA Journal article explains that patient records, like those stolen from ALN, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[20]

58.    Data breaches such as the one experienced by Defendant ALN have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets.

59.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2020.[21]

60.    HHS data shows that more than 39 million patients' information was exposed in the first half of 2023, in nearly 300 incidents, and that healthcare breaches have doubled between 2020 and 2023, according to records compiled from HHS data by Health IT Security.[22]

61.    According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical

---

[19] *Id.*

[20] *Id.*

[21] Maria Henriquez, *Iowa City hospital suffers phishing attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

[22] Jill McKeon, *Biggest Healthcare Data Breaches Reported This Year, So Far,* Informa TechTarget (Jun. 26, 2023), https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far.

record for up to $1,000."[23]

62.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known the Personal Information it collected and maintained would be targeted by cybercriminals.

63.     Moreover, healthcare companies are targeted because of their cybersecurity vulnerabilities: "…healthcare is also targeted because it is very vulnerable. Many healthcare providers use outdated IT infrastructure and operating systems that can no longer be patched or supported, such as Windows 7 and Windows Server 2008, even after Microsoft retired them. Further, more than half of medical devices operate on legacy systems, and 83% of medical imaging devices are on outdated operating systems that no longer receive patches/updates. This creates significant cybersecurity vulnerabilities and makes it much easier for bad actors to find an entry point into the network."[24]

64.     Cyber-attacks against healthcare organizations such as Defendants are targeted and frequent. According to the 2019 Health Information Management Systems Society, Inc. ("HIMMS") Cybersecurity Survey, "[a] pattern of cybersecurity threats and experiences is discernable across U.S. healthcare organizations. Significant security incidents are a near-universal experience in U.S. healthcare organizations with many of the incidents initiated by bad actors…"[25]

---

[23] *5 Important Elements to Establish Data Security in Healthcare,* AdventHealth University (May 21, 2020), https://www.ahu.edu/blog/data-security-in-healthcare.
[24] *Id*.
[25] *2019 HIMSS Cybersecurity Survey*, Healthcare Information and Management Systems Society, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_R eport.pdf (last visited Apr. 3, 2025).

65.    In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[26]

66.    Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.[27]

67.    According to the Identity Theft Resource Center's January 24, 2022, report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[28]

68.    According to the ITRC's January 2023 report for 2022, "[t]he number of publicly reported data compromises in the U.S. totaled 1,802 in 2022. This represents the second highest number of data events in a single year and just 60 events short of matching 2021's all-time high number of data compromises."[29] In 2022, there were approximately 422 million individuals affected by cyberattacks.[30]

69.    Moreover, of the 1,802 data breaches in 2022, ITRC reported that 1,560 involved compromised names, 1,143 involved compromised of Social Security Numbers, and 633 involved compromised dates of birth—types of PHI included in the unauthorized disclosure in this Data

---

[26] *2019 End of Year Data Breach Report*, Identity Theft Resource Center, https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last visited Apr. 3, 2025).
[27] *Id.*
[28] *2021 Annual Data Breach Report Sets New Record for Number of Compromises*, Identity Theft Resource Center (Jan. 24, 2022), https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/.
[29] *2022 Data Breach Report*, Identity Theft Resource Center (January 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited Apr. 3, 2025).
[30] *Id.*, pg. 2.

Breach.[31]

70.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[32]

71.    Furthermore, Defendants were aware of the risk of data breaches because such breaches have dominated the headlines in recent years. For instance, the 525 reported medical or healthcare data breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[33]

72.    According to the U.S. Department for Health and Human Services' "2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead," "[h]ealthcare data breaches have doubled in 3 years."[34]

73.    PHI is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

74.    PHI can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and medical records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

---

[31] *Id.*, pg. 6.
[32] *Cost of a Data Breach 2022: A million-dollar race to detect and respond*, IBM, https://www.ibm.com/reports/data-breach (last visited Apr. 3, 2025).
[33] *2019 End of the Year Data Breach Report*, *supra* at pg. 15.
[34] *2022 Healthcare Cybersecurity Year in Review, and a 2023 Look-Ahead*, U.S. Department for Health and Human Services, The Health Sector Cybersecurity Coordination Center (HC3) (Feb. 9, 2023), https://www.hhs.gov/sites/default/files/2022-retrospective-and-2023-look-ahead.pdf.

75.    Given the nature of the Data Breach, it was foreseeable that the compromised PHI could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess the Class Members' PHI can easily obtain Class Members' tax returns or open fraudulent credit card accounts in the Class Members' names.

76.    As custodians of Personal Information, Defendants knew, or should have known, the importance of safeguarding the Personal Information entrusted to them, and of the foreseeable consequences if their data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

77.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgment of its duties to keep Personal Information private and secure, Defendants failed to take the appropriate steps to protect the Personal Information of Plaintiff and the Class Members from being compromised.

## E.    Defendants Failed to Comply with FTC Guidelines

78.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

79.    In 2016, the FTC updated its publication, *Protecting PHI: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it

17

occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

80.    The FTC further recommends that companies not maintain PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[36]

81.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

82.    These FTC enforcement actions include actions against entities failing to safeguard PHI such as Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

83.    ALN failed to properly implement basic data security practices widely known throughout the industry, and NSPC failed to ensure that its business associate, ALN, implemented

---

[35] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (October 2016), https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last visited Apr. 3, 2025).
[36] *See id*.

these practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

84.     Defendants were at all times fully aware of their obligations to protect the Personal Information of their current and former patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**F.     Defendants Fail to Comply with Industry Standards**

85.     As shown above, experts studying cyber security routinely identify organizations holding PHI as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[37]

86.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response

---

[37] *Cost of a data breach 2022, supra.*

Management, and Penetration Testing.[38]

87.    In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[39]

88.    Upon information and belief, ALN failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and other industry standards for protecting Plaintiff's and the proposed Class Members' Personal Information—and NSPC failed to ensure that ALN met those standards—resulting in the Data Breach.

---

[38] *CIS Top 18 Critical Security Controls Solution*, Rapid7,
https://www.rapid7.com/solutions/compliance/critical-controls/ (last visited Apr. 3, 2025).
[39] *Understanding the NIST cybersecurity framework*, Federal Trade Commission,
https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last visited Apr. 3, 2025).

89.    Several best practices have been identified that, at a minimum, should be implemented by healthcare providers like Defendants, including, but not limited to, educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

90.    These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

## G.    Defendants' Conduct Violate HIPPA

91.    Defendants are covered entities under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

92.    Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[40] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

93.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

94.    Title II of HIPAA contains what are known as the Administrative Simplification

---

[40] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Personal Information like the data Defendants left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

95.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

96.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

97.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

98.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

99.     HIPAA's Security Rule requires Defendants to do the following:

A.     Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

B.     Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

C.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

D.    Ensure compliance by its workforce.

100.    HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

101.    HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

102.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[41]

103.    HIPAA requires a covered entity to have and apply appropriate sanctions against patients of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

---

[41] *Health Information Privacy; Breach Notification Rule,* U.S. Department of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Apr. 3, 2025).

104.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E, by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

105.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, Security Rule Guidance Material.[42] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[43]

106.    A Data Breach such as the one Defendants experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

---

[42] *Health Information Privacy; Security Rule Guidance Material*, U.S. Department of Health & Human Services, http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Apr. 3, 2025).

[43] *Health Information Privacy; Guidance on Risk Analysis*, U.S. Department of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Apr. 3, 2025).

107. Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations

**H.    The Data Breach Caused Plaintiff and the Class Members Injury and Damages**

108. Plaintiff and members of the proposed Class have suffered injury and damages from the unauthorized disclosure of their Personal Information in the Data Breach that can be directly traced to ALN's failure to adequately protect that Personal Information, and NSPC's failures to ensure ALN adequately protected that Personal Information, which has occurred, is ongoing, and/or imminently will occur.

109. As stated *supra*, during the Data Breach, unauthorized cybercriminals were able to access the Plaintiff's and the proposed Class Members' Personal Information, which on information and belief is now being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

110. The ramifications of Defendants' failure to keep Plaintiff's and the Class's Personal Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

111. Because Defendants collectively failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, are at an increased risk of suffering, or will imminently suffer:

a.    exposure of that Personal Information, including said information being

posted on the Dark Web for fraudulent, criminal activity or sale;

b.    fraudulent misuse of Personal Information, including fraudulent loans taken out using Personal Information acquired in the Data Breach, fraudulent cellular telephone accounts taken out using Personal Information acquired in the Data Breach; and, identity theft and impersonation using Personal Information acquired in the Data Breach;

c.    Malware, and increase in spam emails;

d.    The loss of the opportunity to control how Personal Information is used;

e.    The diminution in value of their Personal Information;

f.    The compromise and continuing publication of their Personal Information;

g.    Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

h.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

i.    Emotional Distress;

j.    Delay in receipt of tax refund monies;

k.    Unauthorized use of stolen Personal Information; and

l.    The continued risk to their Personal Information, which remains in the possession of Defendants and is subject to further breaches so long as ALN fails to undertake the appropriate measures to protect the Personal

Information in its possession, and NSPC to ensure ALN undertakes these measures.

112.    Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

113.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[44]

114.    The FTC recommends that identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.[45]

115.    The time-consuming process recommended by the FTC and other experts is

---

[44] Gaetano DiNardi, *14 Dangers of Identity Theft That Can Leave You Reeling,* Aura (Oct. 27, 2023), https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open %20new%20accounts,to%20repair%20your%20credit%20score.
[45] *See What To Do Right Away*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Apr. 3, 2025).

complicated by the vulnerable situations of Defendants' patients.

116.    Identity thieves use stolen Personal Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

117.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

118.    In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Personal Information to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

119.    Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage.  Fifty-four percent reported feelings of being violated. [46]

120.    What's more, theft of Personal Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become

---

[46] Jason Steele, *Credit card fraud and ID Theft Statistics*, CreditCards.com (June 11, 2021), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ (citing *2021 Consumer Aftermath Report*, Identity Theft Resource Center (May 26, 2021) https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/).

interconnected through the lens of massively complex cloud computing, Personal Information is a valuable property right.[47]

121.    The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that PHI has considerable market value.

122.    Theft of Personal Information, in particular, is problematic because: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[48]

123.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed Personal Information to adjust their insureds' medical insurance premiums.

124.    It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between when Personal Information and/or financial information is stolen and when it is used.

125.    Personal Information and financial information are such valuable commodities to

---

[47] John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, Richmond Journal of Law & Technology (2009), https://scholarship.richmond.edu/jolt/vol15/iss4/2/. ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[48] *What To Know About Medical Identity Theft,* Federal Trade Commission, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Apr. 3, 2025).

identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

126.    Where the most Personal Information belonging to Plaintiff and Class Members was accessible from ALN's network, there is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

127.    Thus, Plaintiff and the Class Members must vigilantly monitor their financial and medical accounts for many years to come.

128.    According to cybersecurity experts, "[r]eports show the value of a health record can be worth as much as $1,000, whereas on the dark web, a credit card number is worth $5 and Social Security numbers are worth $1."[49]

129.    Social Security numbers are among the worst kind of PHI to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[50]

130.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[51] Each of these fraudulent

---

[49] Sanjay Cherian, *supra.*
[50] *Identity Theft and Your Social Security Number*, U.S. Social Security Administration, Publication No. 05-10064 (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[51] *See id.*

activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

131.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[52]

132.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[53] Medical information is especially valuable to identity thieves. The asking price on the Dark Web for medical data is $50 per person and up.[54]

133.     Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the imminent identity fraud and criminal fraudulent activity; lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

---

[52] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[53] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, Network World (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[54] Omri Toppol, *Email Security: How You Are Doing It Wrong & Paying Too Much*, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/.

134.    Defendants knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and ALN should have strengthened its data systems accordingly, and NSPC should have ensured that ALN did so before entrusting Plaintiff's and the Class Members' Personal Information to ALN.

135.    To date, Defendants have done little to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach.

136.    Defendant ALN has merely offered one year of credit monitoring services. Defendant ALN's offer to provide even these limited services are inadequate as victims are likely to face many years of identity theft.

137.    Defendant ALN's offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Personal Information, out-of-pocket costs, and the time they are required to spend attempting to mitigate their injuries.

138.    Furthermore, Defendant ALN's credit monitoring offer and advice to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on the Defendants, to investigate and protect themselves from Defendants' tortious acts resulting in the Data Breach. Defendant ALN merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

139.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Personal Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

140.    Plaintiff's and Class Members' Personal Information was compromised and exfiltrated by cybercriminals as a direct and proximate result of the Data Breach.

141.    Plaintiff and Class Members were damaged in that their Personal Information is now in the hands of cybercriminals, sold and potentially for sale for years into the future.

142.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

143.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

144.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Personal Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

145.    Plaintiff and Class Members also suffered a loss of value of their Personal Information when it was acquired by cyberthieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

146.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their financial accounts and records for misuse.

147.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.    Finding fraudulent charges;

    b.    Canceling and reissuing credit and debit cards;

    c.    Purchasing credit monitoring and identity theft prevention;

d.    Monitoring their medical records for fraudulent charges and data;

e.    Addressing their inability to withdraw funds linked to compromised accounts;

f.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g.    Placing "freezes" and "alerts" with credit reporting agencies;

h.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i.    Contacting financial institutions and closing or modifying financial accounts;

j.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.    Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.    Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

148.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

149.    Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Personal Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

150.    Defendants delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Personal Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. ALN obtained knowledge of the Data Breach on or about March 2024, but did not notify the victims until March 21, 2025. Yet, neither Defendants offered an explanation for the delay. This delay violates HIPAA and other notification requirements and increased the injuries to Plaintiff and Class Members.

151.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[55] According to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[56]

152.    Defendant ALN did not rapidly report to Plaintiff and Class Members that their Personal Information had been stolen. Defendant ALN waited approximately a year after being made aware of the Data Breach to notify impacted individuals.

153.    Defendant ALN only began notifying certain affected persons of the Data Breach

---

[55] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/ 2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20 complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion.
[56] *Id.*

by U.S. mail on March 21, 2025, despite having access to more expedient means of communication.

154.    According to UK security firm Sophos, "[c]yberattackers on average have 11 days after breaching a target network before they're being detected...and often when they are spotted it's because they've deployed ransomware."[57] Sophos found that this was "more than enough time for an attacker to get a thorough overview of what a target network looks like, where their weaknesses lie, and for ransomware attackers to wreck it."[58]

155.    To put in context, according to Sophos, "11 days potentially provide attackers with approximately 264 hours for malicious activity, such as lateral movement, reconnaissance, credential dumping, data exfiltration, and more. Considering that some of these activities can take just minutes or a few hours to implement, 11 days provide attackers with plenty of time to do damage."[59]

156.    Defendant ALN obtained knowledge of the Data Breach in or about March 2024. But even after obtaining knowledge of the Data Breach, Defendants further delayed notifying the Plaintiff and Class Members, leaving them unaware that their Personal Information had been stolen. As a result, Plaintiff and Class Members were deprived of a window of opportunity to take preventative measures such as rapid reporting.

## CLASS ACTION ALLEGATIONS

157.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated (the "Class"):

---

[57] Liam Tung, *This is how long hackers will hide in your network before deploying ransomware or being spotted*, ZDNet (May 19, 2021), https://www.zdnet.com/article/this-is-how-long-hackers-will-spend-in-your-network-before-deploying-ransomware-or-being-spotted/.
[58] *Id.*
[59] *Id.*

All persons residing in the United States whose Personal Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class").

158. Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

159. Plaintiff reserves the right to amend or modify the Class definitions as this case progresses.

160. <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals whose sensitive data was compromised in the Data Breach.

161. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a.    if Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Personal Information;

   b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

   c.    if Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

   d.    if Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

    e.     if Defendants owed a duty to Class Members to safeguard their Personal Information;

    f.     if Defendants breached their duty to Class Members to safeguard their Personal Information;

    g.    if Defendants knew or should have known that their data security systems and monitoring processes were deficient;

    h.    if Defendants should have discovered the Data Breach sooner;

    i.     if Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

    j.     if Defendants' conduct was negligent;

    k.    if Defendants' breach implied contracts with Plaintiff and Class Members;

    l.     if Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

    m.   if Defendants failed to provide notice of the Data Breach in a timely manner, and;

    n.    if Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

162.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

163.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

164.    <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

165.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

166.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

167.    Likewise, particular issues under Rule 42(d)(l) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    if Defendants failed to timely notify the public of the Data Breach;

b.    if Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.    if Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.    if Defendants' failure to institute adequate protective security measures amounted to negligence;

e.    if Defendants failed to take commercially reasonable steps to safeguard consumer PII; and

f.    if adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

168.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Proposed Class)

169.    Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

170.    Plaintiff and the Class Members entrusted their Personal Information to NSPC, and other medical providers, who entrusted the Personal Information to ALN to perform medical

billing services.

171.    Defendants owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using the Personal Information in their care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

172.    Further, Defendant NSPC owed to Plaintiff a duty to exercise reasonable care in supervising ALN to ensure ALN adequately protected the Personal Information which NSPC had entrusted to ALN.

173.    Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure to collectively adequately safeguard the Personal Information in accordance with industry standards concerning data security would result in the compromise of that Personal Information—just like the Data Breach that ultimately came to pass. Defendants NSPC and ALN acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's Personal Information by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the Personal Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

174.    Defendants owed to Plaintiff and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their Personal Information. Defendants also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Personal Information, to be vigilant

in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

175.    Defendants owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants NSPC, and ALN knew or should have known would suffer injury-in-fact from said Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiff's and members of the Class's Personal Information.

176.    The risk that unauthorized persons would attempt to gain access to the Personal Information and misuse it was foreseeable. Given that Defendants holds vast amounts of Personal Information, it was inevitable that unauthorized individuals would attempt to access their databases containing the Personal Information—whether by a sophisticated cyberattack or otherwise.

177.    Personal Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Personal Information of Plaintiff and Class Members and the importance of exercising reasonable care in handling it, and of NSPC in supervising ALN's handling of that information.

178.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, employees, contractors, vendors, and suppliers, and in handling and securing the Personally Information of Plaintiff and Class Members, and by NSPC failing to ensure ALN did so, which actually and proximately caused the Data Breach and Plaintiff's and Class Members' injury-in-fact and damages.

179.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-

in-fact.

180.    As a direct, proximate, and traceable result of Defendants' negligence, Plaintiff has suffered or will imminently suffer injury-in-fact and damages, as set forth in the preceding paragraphs.

181.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including: exposure of that Personal Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional Distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; the continued risk to their Personal Information, which remains in the possession of Defendants and is subject to further breaches so long as ALN fails to undertake the appropriate measures to protect the Personal Information in its possession, and NSPC fails to ensure ALN undertakes these measures; and, an increased risk of fraud and identity theft.

182.    As a result of the negligence of Defendants, Plaintiff and the Class Members are

entitled to recover actual, compensatory, and punitive damages.

183.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) properly notify affected victims of the Data Breach (ii) strengthen their data security systems and monitoring procedures; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) provide adequate credit monitoring to all Class Members.

184.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the Personal Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the exposure of the Personal Information of Plaintiff and the Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff Proposed Class)

185.    Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

186.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Personal Information.

187.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, patients' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff's and the members of the Class's sensitive Personal

Information.

188.    Defendants violated their respective duties under Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Plaintiff's and the Class's Personal Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Personal Information Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to patients in the event of a breach, which ultimately came to pass.

189.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and the Class Members.

190.    Defendants had a duty to Plaintiff and the Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's Personal Information, and NSPC had the duty to supervise its service provider, ALN, to ensure it did so.

191.    Defendants breached their respective duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's Personal Information.

192.    Defendants' violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations including HIPAA constitutes negligence *per se*.

193.    But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

194.    The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Defendants' breaches of their duties. Defendants knew or should have known that they were failing to meet their duties and that a breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Personal Information.

195.    Had Plaintiff and members of the Class known that Defendants did not adequately protect their Personal Information, Plaintiff and members of the Class would not have entrusted Defendants with their Personal Information.

196.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and members of the Class have suffered actual, tangible, injury-in-fact and damages, including: exposure of that Personal Information, including being posted on the Dark Web for fraudulent, criminal activity or sale; fraudulent misuse of Personal Information including fraudulent loans, fraudulent cellular telephone accounts, and identity theft and impersonation using Personal Information acquired in the Data Breach; malware, and increase in spam emails; loss of the opportunity to control how Personal Information is used; diminution in value of their Personal Information; compromise and continuing publication of their Personal Information; out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; emotional distress; delay in receipt of tax refund monies; unauthorized use of stolen Personal Information; the continued risk to their Personal Information, which remains in the possession of Defendants and is subject to further breaches so long as ALN fails to undertake

the appropriate measures to protect the Personal Information in its possession, and NSPC fails to ensure ALN undertakes these measures; and, an increased risk of fraud and identity theft.

197.    As a result of the negligence *per se* of Defendants, Plaintiff and the Class Members are entitled to recover actual, compensatory, and punitive damages.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Proposed Class)**

198.    Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

199.    Defendant NSPC offered to provide medical services to Plaintiff and the Class Members in exchange for their Personal Information and in exchange for amounts paid for medical treatment and services that included payment for data security.

200.    NSPC entrusted the Personal Information of Plaintiff and the proposed Class Members to ALN, their business associate, in order for ALN to perform medical billing services.

201.    Plaintiff and the Class Members accepted Defendant NSPC's offer by providing Personal Information to NSPC, and in turn to ALN, in exchange for medical services.

202.    In turn, and through internal policies described in the preceding paragraphs, and other conduct and representations, Defendants agreed they would not disclose the Personal Information they collect to unauthorized persons and that they would safeguard patient Personal Information, including by Personal Information supervising their business associate, ALN, to ensure it adequately safeguarded patient Personal Information.

203.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Personal Information.

204.    Plaintiff and the Class Members would not have entrusted their Personal Information to Defendants in the absence of such an agreement with NSPC, and ALN.

205.    Defendants materially breached the contract(s) each had entered into with Plaintiff and the Class Members by failing to safeguard their Personal Information, including by NSPC failing to supervise ALN to ensure it properly safeguarded their Personal Information, and by failing to notify them promptly of the Data Breach to ALN's computer systems that compromised such information. NSPC further breached the implied contracts with Plaintiff and the Class Members by:

a.    Failing to properly safeguard and protect Plaintiff's and members of the Class's Personal Information, including NSPC failing to properly supervise ALN to ensure it safeguarded the Personal Information entrusted to it;

b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

c.    Failing to ensure the confidentiality and integrity of electronic Personal Information that Defendants created, received, maintained, and transmitted.

206.    The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of its agreement(s).

207.    Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

208.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to

their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

209.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

210.    Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

211.    In these and other ways, Defendants violated their duties of good faith and fair dealing.

212.    Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendants' breaches of their agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

213.    As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and the proposed Class Members and are entitled to actual, compensatory, and consequential damages.

**COUNT IV**
**THIRD-PARTY BENEFICIARY**
**(On Behalf of Plaintiff and the Proposed Class)**

214.    Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

215.    Plaintiff and the proposed Class Members are third-party beneficiaries of contracts between ALN and NSPC, and likely between ALN and other medical providers, under which ALN: received Plaintiff's and the Class's Personal Information; stored that information in its

computer network systems; and provided medical billing and revenue cycle management services to their medical service providers.

216.    Plaintiff and the proposed Class Members, as patients of NSPC or other parties in contract with ALN, were the intended beneficiaries of these contracts, in that the contracts all related to the provision of medical services to Plaintiff and the Class.

217.    Defendants have breached the foregoing contracts by failing to adequately protect Plaintiff's and the Class Members' Personal Information, resulting in the Data Breach, and injury-in-fact and damages.

218.    Defendants each materially breached the contract(s) each had entered into by failing to safeguard the Personal Information entrusted to it, including by NSPC failing to properly supervise ALN to endure it safeguarded Plaintiff's and the Class's Personal Information, and including breaches of the covenant of good faith and fair dealing.

219.    As a direct and proximate result, Plaintiff and Class Members are entitled to actual, compensatory, and consequential damages.

## COUNT V
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Proposed Class)

220.    Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

221.    This claim is pleaded as the alternative to the breach of implied contractual duty claim.

222.    Plaintiff and the Class Members conferred a benefit upon Defendants in the form of monies paid for medical treatment services and by providing their Personal Information to Defendants in order to receive such services.

223.    Defendants appreciated or had knowledge of the benefits conferred upon themselves by Plaintiff and the Class Members.

224.    As a result of Defendants' conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference in value between the purchases made with reasonable data privacy and security practices and procedures that Plaintiff and the Class Members paid for, and the purchases without unreasonable data privacy and security practices and procedures that they received.

225.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and the proposed Class Members' payments and their Personal Information because Defendants failed to adequately protect their Personal Information, and because NSPC failed to properly supervise ALN to ensure it protected Plaintiff's and the Class Members' Personal Information. Plaintiff and the Class Members would not have provided their Personal Information, nor used and paid for Defendants' services, had they known Defendants would not adequately protect their Personal Information.

226.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach alleged herein.

## COUNT V
## INVASION OF PRIVACY—PUBLIC DISCLOSURE OF PRIVATE FACTS
### (On Behalf of Plaintiff and the Proposed Class)

227.    Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

228.    Plaintiff and the Class Members took reasonable and appropriate steps to keep their Personal Information confidential from the public.

229.    Plaintiff and the Class Members' efforts to safeguard their own Personal Information were successful, as their Personal Information was not known to the general public prior to the Data Breach.

230.    Plaintiff and the Class Members had a legitimate expectation of privacy in their Personal Information, entrusted solely to NSPC for purpose of receiving medical treatment, which NSPC disclosed to ALN to perform medical billing services; and Plaintiff and the Class were entitled to the protection of this information against disclosure to unauthorized third parties.

231.    Defendants owed a duty to Plaintiff and the Class Members to keep their Personal Information confidential.

232.    The unauthorized release of Personal Information by Defendants in the Data Breach is highly offensive to a reasonable person.

233.    Plaintiff and the Class Members' Personal Information is not of legitimate concern to the public.

234.    Defendants knew or should have known that Plaintiff and Class Members' Personal Information was private, confidential, and should not be disclosed.

235.    Defendants publicized Plaintiff and members of the Class's Personal Information, by unauthorizedly disclosing it to cyber criminals who had no legitimate interest in this Personal Information and who had the express purpose of monetizing that information through fraudulent misuse and by injecting it into the illicit stream of commerce flowing through the Dark Web.

236.    Indeed, not only is Plaintiff and members of the Class's Personal Information published on the Dark Web, but upon information and belief, it is being used to commit fraud; it is being disseminated amongst, *inter alia,* financial institutions, merchants, creditors, health care providers and governmental agencies.

237.   It is therefore substantially certain that the Plaintiff and the Class Members' Personal Information is rapidly becoming public knowledge—among the community at large—due to the nature of the cyber-attack that procured it, and the identity theft for which it is designed.

238.   As a direct and proximate result of the invasion of privacy, public disclosure of private facts committed by Defendants, Plaintiff and the members of the Class have suffered injury-in-fact and damages as set forth in the preceding paragraphs.

## COUNT VI
### DECLARATORY AND INJUNCTIVE RELIEF, 28 U.S.C. § 2201
### (On Behalf of Plaintiff and the Proposed Class)

239.   Plaintiff repeats and re-alleges paragraphs 1 through 149 of this Complaint and incorporates them by reference herein.

240.   This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

241.   Defendants owe a duty of care to Plaintiff and Class Members that required them to adequately secure their Personal Information.

242.   Defendants still possesses Plaintiff's and Class Members' Personal Information, yet they do not adequately protect Personal Information against the threat of a data breach.

243.   Defendants have not satisfied their contractual obligations and legal duties to Plaintiff and Class Members.

244.   Actual harm has arisen in the wake of the Data Breach regarding Defendants' obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their Personal Information and Defendants' ongoing failure to address the security failings that led to such exposure.

245.    There is no reason to believe that Defendants' security measures are any more adequate now than it before the Data Breach.

246.    Plaintiff, therefore, seeks a declaration (1) that Defendants' existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security, and (2) that to comply with their obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, being ordered as follows:

    a.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    b.    ordering that Defendants engage internal and external security personnel to conduct testing, including audits on Defendants' computer and network systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    c.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    d.    ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

    e.    ordering that Defendants audit, test, and train their security personnel and employees regarding any new or modified data security policies and procedures;

f.   ordering that Defendants purge, delete, and destroy, in a reasonably secure manner, any Personal Information not necessary for their provision of services;

g.   ordering that Defendants conduct regular database scanning and security checks;

h.   prohibiting Defendants from maintaining Personal Information of Plaintiff and Class Members on a cloud-based database;

i.   requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

j.   ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive Personal Information;

k.   requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding paragraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

l.   requiring Defendants to meaningfully educate all Class Members about the threats they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

      m.     requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

      n.     such other and further relief as this Court may deem just and proper.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually, and on behalf of all others similarly situated individually, requests that the Court enter an order:

    A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representatives, and appointing Plaintiff's counsel to represent the Class;

    B.    Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

    C.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

    D.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

    E.    Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

    F.    Awarding attorneys' fees and costs, as allowed by law;

G.      Awarding prejudgment and post-judgment interest, as provided by law;

H.      Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.      Granting such other or further relief as may be appropriate under the circumstances.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 4, 2025

Respectfully submitted,

*/s/Andrew W. Ferich*
Andrew W. Ferich
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

*Counsel for Plaintiff and the Putative Class*